DICELLO LEVITT

485 LEXINGTON AVENUE SUITE 1001 NEW YORK, NEW YORK 10017

GREG G. GUTZLER
GGUTZLER@DICELLOLEVITT.COM
646.933.1000

September 25, 2026

**VIA ECF**

The Honorable Henry J. Ricardo
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *Kovalenko, et al. v. Ubiquiti, Inc., Case No. 26-cv-06838***

Dear Judge Ricardo:

Plaintiffs write in response to Defendant Ubiquiti's September 18, 2026 letter (ECF No. 19). Defendant's letter is heavy on factual disputes, but light on purported pleading-defects or legal defenses.

**The Allegations are Plausible and Well-Founded in Law**

Ubiquiti's airMax radio bridges are military-grade communications technology, subject to international arms agreements and U.S. export controls. Compl. ¶¶ 44–45 (ECF No. 4). After Russia's full-scale invasion of Ukraine in February 2022, the United States banned their export to Russia. *Id.* ¶¶ 47–52. And for good reason—U.S. authorities determined that such devices are "necessary to Russia's war machine." *Id.* ¶ 51.

That finding was correct: Russia, by its own admission, has deployed Ubiquiti devices across occupied Ukraine. Defendants' devices provide the critical infrastructure of Russia's command-and-control network—the central nervous system of the Russian army—linking drone operators, reconnaissance teams, and commanding officers. *Id*. ¶ 107. The forces coordinated by that command-and-control system—using banned Ubiquiti devices—hunted Plaintiffs and their loved ones in a sadistic "human safari." *Id.* ¶¶ 111–153.

Ubiquiti is liable for two reasons. *First*, it refused to deactivate these atrocities through one simple, low-cost design feature: encoding a "kill switch" in airMax firmware to remotely disable devices in sanctioned jurisdictions. *Id.* ¶¶ 96–103. This was technically feasible: the geolocation

and push-update infrastructure was already in place. *Id.* ¶ 97. And it was commercially feasible: this safer alternative design was adopted by another major American tech firm to prevent Russia from deploying devices to murder Ukrainian civilians. *Id.* ¶ 99.

*Second*, instead of complying with U.S. export controls, it affirmatively maintained—and concealed—a distribution network through notorious smuggling hubs. *Id.* ¶¶ 55–57, 60–66, 73, 82, 85. U.S. authorities warned that this was Russia's sanctions-evasion pipeline. *Id.* ¶ 60, 85. But Ubiquiti chose to keep that pipeline open, feeding the Russian military's demand for banned devices. *Id.* ¶¶ 61–66, 82–83. It disregarded all red flags: its exports to Russia should have dropped to zero; instead, trade data shows a 60% surge into a sanctioned state. *Id.* ¶ 58. After the initial 2014 invasion, its own CEO publicly admitted that its distributors "more than likely move some products into Russia." *Id*. ¶¶ 55, 73.

Ubiquiti told investors it was "monitoring" the conflict. *Id.* ¶ 70. Here's what it must have seen: Russian state and social media showed video after video of Russian troops using its devices to attack Ukrainians.[1] *Id.* ¶¶ 76–80. Here's what it must have heard: U.S. authorities formally determined those troops were committing "crimes against humanity." *Id.* ¶ 39. Here's what it couldn't avoid: thousands of devices phoned home to Ubiquiti servers with telemetry data locating them in Russia and occupied Ukraine. *Id.* ¶ 75. Rather than disable them, Ubiquiti supported them, thereby servicing Russia's military infrastructure with firmware updates. *Id.* ¶ 67.

Ubiquiti put profit over simple technological safeguards, arms-control compliance, and its duty of care to foreseeable victims. It did so, according to a former employee, because its CEO "just doesn't care about all of the extra garbage." *Id.* ¶ 88.

Defendant makes the unsubstantiated factual claim that it played no causal role in Russia's brutal attacks. But the Russian Ministry of Defense disagrees: it released videos of troops installing Ubiquiti radio bridges in Ukraine and hailed the devices for "significantly increas[ing] the effectiveness of unit command and control." *Id.* ¶ 109. That same command-and-control system coordinated the forces that attacked Plaintiffs. *Id.* ¶¶ 107–111,120, 128, 135, 141, 149. And it was all foreseeable: the risk of arming Russian atrocities was precisely what the U.S. sanctions aimed to prevent. *Id*. ¶¶ 43, 50–51, 82, 85, 104.

These plausible allegations more than satisfy Rule 12(b)(6) pleading requirements:

1. *Article III standing and causation*: The Complaint plausibly alleges that Russian perpetrators admitted they used banned Ubiquiti devices to coordinate their operations; those operations injured Plaintiffs. Compl. ¶¶ 109–110. Ubiquiti could have stopped this by remotely disabling the devices or cutting off straw purchasers.

2. *Negligent entrustment*: The Complaint plausibly alleges that Ubiquiti unlawfully created and concealed a criminal market for export-controlled devices—and it

[1] Defendant's erroneous claim that the complaint is based on a sole media report—which even if true would be immaterial to a 12(b)(6) motion—is belied by the Complaint's quoted and screen-shotted Russian state-media videos, Compl. ¶¶ 77–78, 109, and inclusion of first-person observations by Ukrainian officials, *e.g., id.* ¶ 108.

knew or should have known it was distributing to smugglers and pushing updates to end-users murdering civilians. *Id.* ¶¶ 69–83. *See, e.g.*, *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 343 (E.D.N.Y. 2007); *Williams v. Beemiller, Inc.*, 103 A.D.3d 1191, 1191 (N.Y. App. Div. 2013).

3. *Public Nuisance*: There is no credible dispute that a human safari—coordinated and maintained by banned devices—is a nuisance threatening public health and safety. The Complaint plausibly alleges Defendant maintained this. Compl. ¶¶ 77–78, 107. *See, e.g.*, *A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. at 343. And New York has announced an unequivocal public policy against allowing business activity in the state to contribute to Russian atrocities.

4. *Product Liability*. Failing to include a feasible safety feature is a paradigmatic design defect under New York law. *See, e.g.*, *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107 (1983) (holding a power saw's lack of a safer guardrail was a prima facie design defect).

5. *NIED and Aiding and Abetting*. The Complaint plausibly states all the elements of Negligent Infliction of Emotional Distress with regards to Plaintiffs Diana Kovalenko and Olena Kobylianska. *See* Compl. ¶¶ 121, 123, 125, 143, 145; *Bovsun v. Sanperi*, 461 N.E.2d 843, 848 (N.Y. 1984). Plaintiffs' allegations, including that Ubiquiti, acting with actual knowledge, supplied Russia with military communications equipment through an unlawful distribution scheme in violation of export controls are sufficient to plead aiding and abetting under New York law. *See*, *e.g.*, Compl. ¶¶ 57, 69-89; *Nathel v. Siegal*, 592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008). There can be no serious contention that Russia's deliberate lethal attacks on civilians were not tortious. *E.g., Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021).

6. *Preemption*. Defendant identifies no federal law that preempts Plaintiffs' common-law tort claims—which are entirely consistent with federal law and policy prohibiting the export of restricted communications equipment for the Russian military's end use. *See* Compl. ¶¶ 47-52; Imposition of Sanctions Against Belarus Under the Export Administration Regulations (EAR), 87 Fed. Reg. 13,048, 13,053, 13,063 (Mar. 8, 2022).

Plaintiffs look forward to fully briefing these issues.

Sincerely,

Greg G. Gutzler
Emma L. Bruder
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001

New York, NY 10017
(646) 933-1000
ggutzler@dicellolevitt.com
ebruder@dicellolevitt.com

Scott A. Gilmore*
Nicole Arenth (admitted pro hac vice)
**DICELLO LEVITT LLP**
801 17th Street, NW, Suite 430
Washington, DC 20006
Tel: (202) 975-2288
sgilmore@dicellolevitt.com
narenth@dicellolevitt.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
alevitt@dicellolevitt.com

Mark A. DiCello*
Robert F. DiCello*
Kenneth Abbarno*
**DICELLO LEVITT LLP**
8160 Norton Parkway
Mentor, OH 44060
Tel.: (440) 953-8888
madicello@dicellolevitt.com
rfdicello@dicellolevitt.com
kabbarno@dicellolevitt.com

* *pro hoc vice* forthcoming

***Counsel for the Plaintiffs***

cc: All counsel of record via ECF