**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DIANA KOVALENKO (alias); TARAS KOVALENKO (alias); LIUBOV SAVCHENKO, individually and as next friend of V.S., a minor; VASYL SHESTAK; VALERII KOBYLIANSKYI; OLENA KOBYLIANSKA; and SVITLANA TSYLINKO, individually and as next friend of D.T., a minor,

Plaintiffs,

v.

UBIQUITI, INC.,

Defendant.

Civil Action No. 26-CV-06838

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UBIQUITI INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT WITH PREJUDICE**

**SIMPSON THACHER & BARTLETT LLP**

Nicholas S. Goldin
Timothy G. Cameron
Anthony C. Piccirillo
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
ngoldin@stblaw.com
tim.cameron@stblaw.com
anthony.piccirillo@stblaw.com

Abram J. Ellis
900 G St. NW
Washington, DC 20001
Telephone: (202) 636-5500
aellis@stblaw.com

*Attorneys for Defendant Ubiquiti Inc.*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 4

A. Ubiquiti Is a Manufacturer of a Wide Variety of Inherently Safe Communications Equipment and Software with Broad Applications ........ 4

B. Plaintiffs Allege Third Parties Continued to Move airMAX Devices into Russia After Ubiquiti Stopped Selling Equipment to Customers in Russia Following the 2022 Invasion of Ukraine ........ 4

C. Anecdotal Reports Allegedly Suggest That Some Russian Forces in Ukraine Have Used Ubiquiti airMAX Radio Bridges for Military Communications ........ 5

D. Plaintiffs Allege Injuries Resulting from Russian Drone Attacks in Ukraine ........ 6

E. The Complaint Lacks Factual Allegations of Ubiquiti's Knowledge of Illegal Sales of airMAX Products into Russia or of Widespread Use of Ubiquiti Devices by Russian Forces ........ 7

F. The Complaint Baselessly Claims that Ubiquiti Can Prevent the Use of airMAX Radio Bridges by Russian Forces in Ukraine ........ 8

G. A Short-Seller Affiliate Posts Claims About Ubiquiti Radio Bridges Being Used by Russian Forces in Ukraine ........ 9

LEGAL STANDARD ........ 9

ARGUMENT ........ 10

I. PLAINTIFFS FAIL TO PLEAD FACTUAL CAUSATION ........ 10

II. PLAINTIFFS FAIL TO PLEAD PROXIMATE CAUSATION ........ 12

III. PLAINTIFFS LACK STANDING ........ 15

IV. PLAINTIFFS FAIL TO ALLEGE ANY DUTY REQUIRING UBIQUITI TO PROTECT THEM FROM A FOREIGN MILITARY'S DOWNSTREAM MISUSE OF ITS PRODUCTS, WARRANTING DISMISSAL OF ALL NEGLIGENCE AND PRODUCT LIABILITY CLAIMS (COUNTS I, III–V) ........ 17

V. PLAINTIFFS FAIL TO ALLEGE NEGLIGENT ENTRUSTMENT (COUNT I) ........ 20

VI. PLAINTIFFS FAIL TO STATE A CLAIM FOR PUBLIC NUISANCE (COUNT II) ... 22

VII. PLAINTIFFS FAIL TO ALLEGE ANY PRODUCT DEFECTS (COUNTS III–IV) ..... 24

VIII. PLAINTIFFS FAIL TO ALLEGE NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (COUNT V) ........ 27

IX. PLAINTIFFS FAIL TO ALLEGE THAT UBIQUITI AIDED AND ABETTED ANY ASSAULT, BATTERY, OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNTS VI–VIII) ........ 28

A. Plaintiffs' Claims Fail for Lack of Knowledge ........ 28

B. Plaintiffs' Claims Fail for Lack of Substantial Assistance ........ 29

C. Plaintiffs Fail to Plead an Underlying Battery ........ 29

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Cases**

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
750 N.E.2d 1097 (N.Y. 2001) ........ 17, 19

*ACIM NY, LLC v. Nissan N. Am., Inc.*,
2019 WL 935424 (S.D.N.Y. Feb. 26, 2019) ........ 10

*Ali v. Al-Nahyan*,
808 F. Supp. 3d 88 (D.D.C. 2025) ........ 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 9, 14

*Baker v. Carr*,
369 U.S. 186 (1962) ........ 23

*Bannister v. U.S. Treasury Dep't*,
2021 WL 4443020 (S.D.N.Y. Sept. 28, 2021) ........ 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 9

*Burlington Ins. Co. v. NYC Transit Auth.*,
79 N.E.3d 477 (N.Y. 2017) ........ 11, 12

*City of Rochester v. Premises Located at 10-12 S. Wash. St.*,
687 N.Y.S.2d 523 (N.Y. Sup. Ct. 1998) ........ 23

*Cook v. Schapiro*,
871 N.Y.S.2d 714 (N.Y. App. Div. 2009) ........ 21

*Copart Indus., Inc. v. Consol. Edison Co.*,
362 N.E.2d 968 (N.Y. 1977) ........ 23

*Corrie v. Caterpillar, Inc.*,
503 F.3d 974 (9th Cir. 2007) ........ 23

*Coubaly v. Cargill, Inc.*,
144 F.4th 343 (D.C. Cir. 2025) ........ 16

*Cuoco v. Moritsugu*,
222 F.3d 99 (2d Cir. 2000) ........ 9

*D'Amico v. Christie*,
518 N.E.2d 896 (N.Y. 1987) ........ 19

*Denny v. Ford Motor Co.*,
662 N.E.2d 730 (N.Y. 1995) .......... 24

*Deschamps v. Timberwolf Tree & Tile Serv.*,
101 N.Y.S.3d 418 (N.Y. App. Div. 2019) .......... 10

*Doe v. Combs*,
2024 WL 4635309 (S.D.N.Y. Oct. 30, 2024) .......... 6

*Dunham v. Covidien, LP*,
498 F. Supp. 3d 549 (S.D.N.Y. 2020) .......... 24

*Elsroth v. Johnson & Johnson*,
700 F. Supp. 151 (S.D.N.Y. 1988) .......... 17, 24, 25

*Fleming v. Endo Int'l*,
2019 WL 4378964 (S.D.N.Y. Aug. 27, 2019) .......... 14

*Forni v. Ferguson*,
648 N.Y.S.2d 73 (N.Y. App. Div. 1996) .......... 17, 24

*Francis v. Kings Park Manor, Inc.*,
992 F.3d 67 (2d Cir. 2021) .......... 10, 17, 27

*Grandelli v. City of New York*,
232 N.Y.S.3d 111 (N.Y. App. Div. 2025) .......... 21

*Hamilton v. Beretta U.S.A. Corp.*,
750 N.E.2d 1055 (N.Y. 2001) .......... passim

*Horowitz v. AJP Educ. Found., Inc.*,
2026 WL 945684 (S.D.N.Y. Apr. 1, 2026) .......... 28

*Hu v. City of New York*,
927 F.3d 81 (2d Cir. 2019) .......... 9

*Hughes v. Apple Inc.*,
2024 WL 4828072 (N.D. Cal. Nov. 18, 2024) .......... 26

*Hughes v. Apple Inc.*,
723 F. Supp. 3d 693 (N.D. Cal. 2024) .......... 26

*Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*,
160 F. Supp. 2d 722 (S.D.N.Y. 2001) .......... 30

*King Cnty. v. IKB Deutsche Industriebank AG*,
863 F. Supp. 2d 288 (S.D.N.Y. 2012) .......... 28

*Lauer v. City of New York*,
733 N.E.2d 184 (N.Y. 2000)........................................................................................... 17

*Lihua Gan v. Gsuig Real Est. Member LLC*,
797 F. Supp. 3d 69 (E.D.N.Y. 2025) ............................................................................. 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)......................................................................................................... 16

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006) ............................................................................................ 10

*McCarthy v. Olin Corp.*,
119 F.3d 148 (2d Cir. 1997) ............................................................................................ 17

*Megally v. LaPorta*,
679 N.Y.S.2d 649 (N.Y. App. Div. 1998) ................................................................ 12, 17

*Mortise v. United States*,
102 F.3d 693 (2d Cir. 1996) ............................................................................................ 27

*Naughright v. Weiss*,
826 F. Supp. 2d 676 (S.D.N.Y. 2011) ............................................................................ 29

*Nielsen v. Rabin*,
746 F.3d 58 (2d Cir. 2014) ................................................................................................ 9

*Oden v. Bos. Sci. Corp.*,
330 F. Supp. 3d 877 (E.D.N.Y. 2018) ............................................................................ 10

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006) ............................................................................ 28

*People v. Sturm, Ruger & Co.*,
761 N.Y.S.2d 192 (N.Y. App. Div. 2003) ........................................................ 10, 14, 15, 23

*Purdy v. Pub. Adm'r of Cnty. of Westchester*,
526 N.E.2d 4 (N.Y. 1988)................................................................................................ 19

*Quintana v. B. Braun Med. Inc.*,
2018 WL 3559091 (S.D.N.Y. July 24, 2018) ................................................................ 24

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) .............................................................................................. 15

*Shumylo v. Tex. Instruments Inc.*,
2026 WL 1894422 (N.D. Tex. July 1, 2026)............................................................. 11, 15

*Simon v. Smith & Nephew, Inc.*,
990 F. Supp. 2d 395 (S.D.N.Y. 2013) ........................................................................ 26

*State v. Schenectady Chems., Inc.*,
459 N.Y.S.2d 971 (N.Y. Sup. Ct. 1983) ........................................................................ 23

*Stutts v. De Dietrich Grp.*,
2006 WL 1867060 (E.D.N.Y. June 30, 2006) ........................................................................ 21

*Town of Islip v. Datre*,
245 F. Supp. 3d 397 (E.D.N.Y. 2017) ........................................................................ 22

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ........................................................................ 29

*Voss v. Black & Decker Mfg. Co.*,
450 N.E.2d 204 (N.Y. 1983) ........................................................................ 25

**Constitutional Provisions**

U.S. Const. art. III ........................................................................ 15

**Statutes**

N.Y. C.P.L.R. § 215(3) ........................................................................ 29

**Rules**

Fed. R. Civ. P. 12(b)(1) ........................................................................ 1

Fed. R. Civ. P. 12(b)(6) ........................................................................ 1

S.D.N.Y. Electronic Case Filing Rule 6.14 ........................................................................ 6

Defendant Ubiquiti Inc. ("Ubiquiti") respectfully submits this memorandum in support of its motion to dismiss Plaintiffs' complaint ("Complaint") with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

**PRELIMINARY STATEMENT**

This lawsuit seeks to hold Ubiquiti, a U.S. manufacturer of multi-application civilian network connectivity devices that are used around the world in businesses and homes for lawful purposes, responsible for alleged injuries to Ukrainian citizens caused by Russian military drone attacks in Ukraine. The entire premise of this theory, however, is legally baseless and should be rejected as a matter of law. Ubiquiti cannot be liable for the unauthorized use of its inherently safe civilian equipment in a foreign war on the facts alleged in the Complaint—especially where the foreign military, as here, allegedly obtained the equipment indirectly through a sprawling, multi-layered international network involving downstream distributors and "smugglers." Indeed, the Complaint does not allege that Ubiquiti had any involvement whatsoever with these drone attacks or even any contact at all with the Russian military, and does not allege that Ubiquiti made any component used in these drones or associated weapon systems. The Complaint's conclusory and hypothetical factual assertions do not overcome the following legal deficiencies that each require full dismissal.

*First*, Plaintiffs do not adequately plead two elements that recent case law has reiterated are legally essential: (1) that Ubiquiti's equipment was involved in any of the specific drone strikes that allegedly caused Plaintiffs' injuries; or (2) even if Ubiquiti equipment was involved, that Ubiquiti sold it to anyone (let alone anyone in Russia) post-February 2022—i.e., *after* the U.S. implemented the cited export controls. These pleading deficiencies are underscored by the concession in the very same online article from which the Complaint heavily draws that the

communications equipment allegedly involved in these drone strikes could have been "*made by another manufacturer*." These deficiencies preclude the required factual causation.

*Second*, Plaintiffs do not adequately plead proximate causation. It is well established that where, as here, the connection between alleged misconduct and alleged injuries is based on an attenuated, speculative causal chain involving intervening independent actions and decisions by multiple third parties, a plaintiff cannot as a matter of law establish either proximate causation or Article III standing. Far from alleging any sales by Ubiquiti directly to the Russian military or any link at all between Ubiquiti and the Russian government, Plaintiffs allege that the Russian military acquired Ubiquiti devices through a maze of distributors, exporters, resellers, and even smugglers across Czechia, Turkey, Latvia, Poland, China, Kazakhstan, the United Arab Emirates, Hong Kong, and Kyrgyzstan. Such allegations in the Complaint mean that Plaintiffs cannot establish the required proximate causation or Article III standing.

*Third*, Plaintiffs' tort claims fail because Ubiquiti did not owe the specific duty required under New York law to Plaintiffs. The Complaint does not allege any relationship between Plaintiffs and Ubiquiti, or that some defect in the ordinary or intended operation of Ubiquiti devices caused their injuries. A manufacturer of non-defective, civilian networking devices does not owe a duty to individuals harmed when a foreign military obtained those devices through a chain of downstream transactions beyond the manufacturer's control and used them in military operations. Otherwise, manufacturers of virtually any product or even components of products that find their way to a foreign military could face liability for the unauthorized use of their equipment (or equipment merely incorporating their equipment) in foreign wars. This would be true for makers of cameras, microchips, mobile phones, GPS devices, and fiber-optic cable, to name just a few

examples. New York law, unsurprisingly, does not impose on these manufacturers a general duty to the whole world.

*Fourth*, Plaintiffs' claims fail as a matter of law for the following additional reasons:

- The negligent entrustment claim (Count One) fails because Plaintiffs have conceded that they cannot identify *any case* holding that civilian networking equipment is a "dangerous instrument," which it is not.

- The public nuisance claim (Count Two) fails because the existence of a public nuisance in the context of a foreign war is a non-justiciable political question and the alleged public nuisance is not abatable by a U.S. court.

- The product liability claims (Counts Three and Four) fail because Plaintiffs concede that Ubiquiti radio bridges functioned as intended and do not allege any design defects. The Complaint's allegation that Ubiquiti could and should have implemented a "kill switch" or "whitelist" has no support in the law and depends on a wholly inapposite comparison to SpaceX—a satellite company which, unlike Ubiquiti, retains control over access to its satellite-connected devices. Unsurprisingly, no court has required technology manufacturers to exercise this type of sweeping post-sale surveillance and control over use of their products by downstream purchasers around the world.

- The negligent infliction of emotional distress claim (Count Five) fails because this claim requires that the defendant's conduct placed the plaintiff in the zone of danger. Here, the alleged harm resulted from Russian military drone attacks, and not Ubiquiti's sale of non-defective civilian products into the stream of commerce.

- The aiding and abetting intentional tort claims (Counts Six, Seven, and Eight) fail because the Complaint does not allege that Ubiquiti had actual knowledge of or substantially assisted in the military drone attacks.

In sum, the Complaint should be dismissed in its entirety. Moreover, repleading would be futile and the dismissal should be with prejudice because its fatal legal defects cannot be remedied.

## FACTUAL BACKGROUND

### A. Ubiquiti Is a Manufacturer of a Wide Variety of Inherently Safe Communications Equipment and Software with Broad Applications

Ubiquiti manufactures wireless network equipment and related software. Compl. ¶¶ 35–37. This lawsuit is about Ubiquiti's airMAX platform and airMAX "radio bridges"—antenna-like devices that provide long-range wireless networks—that have widespread lawful civil uses, including in telecommunications infrastructure in rural and remote areas. *Id.* ¶¶ 4, 45.

### B. Plaintiffs Allege Third Parties Continued to Move airMAX Devices into Russia After Ubiquiti Stopped Selling Equipment to Customers in Russia Following the 2022 Invasion of Ukraine

Before Russia invaded Ukraine on February 24, 2022 (the "2022 Invasion"), Ubiquiti's global distribution network included Russia, as was legally permissible at the time. *See id.* ¶¶ 54–56. The Complaint does not allege that Ubiquiti has ever sold devices to the Russian government or military, either before or after the 2022 Invasion.

Following the 2022 Invasion, the United States Bureau of Industry and Security ("BIS") banned the export to Russia of certain network connectivity products, including airMAX radio bridges and a wide range of other multi-use civilian products. *Id.* ¶¶ 48–49. Ubiquiti immediately implemented measures to comply with this ban. *Id.* ¶¶ 56–57.

Plaintiffs allege that after 2022, the Russian military obtained unspecified Ubiquiti devices "through a smuggling network." *Id.* ¶ 53. The Complaint alleges that this network involved an

unspecified number of buyers and sellers in multiple undefined international transactions, including: a distributor in Czechia; a Kazakh company that allegedly sourced devices from distributors in Latvia, Poland, and China; “18 Turkish re-exporters”; an unspecified number of “resellers in Kazakhstan, the United Arab Emirates, Hong Kong, and Kyrgyzstan”; and a network of “straw purchasers” in Russia. *Id.* ¶¶ 61–65. Plaintiffs characterize this maze as part of Ubiquiti’s “sanctions-evasion scheme,” but do not provide any plausible support or detail regarding the genesis or operation of that scheme or Ubiquiti’s alleged role in it. *Id.* ¶¶ 60, 63–64. Plaintiffs do not allege any tangible connection, ownership interest, or communications at all between Ubiquiti and *any* of those third parties.

The Complaint includes a vague allegation that “[f]or the first seven months of the U.S. export ban, from March to October 2022, Ubiquiti directly shipped banned 5A002 military-communications equipment to its authorized Russian distributors, who armed the invading forces.” *Id.* ¶ 57. Plaintiffs do not plead anything in support of that generalized assertion, such as an allegation that Ubiquiti had anything to do with any alleged subsequent sales to the military.[1]

### C. Anecdotal Reports Allegedly Suggest That Some Russian Forces in Ukraine Have Used Ubiquiti airMAX Radio Bridges for Military Communications

Citing a handful of apparently unsubstantiated reports, the Complaint alleges that the Russian military has used airMAX radio bridges in Ukraine. *See id.* ¶¶ 77, 78, 80, 108–110. However, the Complaint does not allege that airMAX radio bridges are the only devices that were or could be used by the Russian military for drone communications. The Complaint relies heavily on an online article (“Hunterbrook Claims”) by Hunterbrook Media, which it describes as “an

[1] Plaintiffs allege—based on vague, unspecified references to unattributed “Russian customs data”—that there was a “surge” in imports of Ubiquiti devices into Russia after the 2022 Invasion. Compl. ¶ 58. Once again, Plaintiffs do not allege that such imports occurred by or at the direction of Ubiquiti.

investigative news outlet" even though it is actually an affiliate of an investment firm with a short position in Ubiquiti securities that has an acknowledged financial interest in driving down Ubiquiti's stock price.[2] *See* Compl. ¶¶ 91–93. And the Hunterbrook Claims themselves acknowledge that suppliers to the Russian military pursued communications equipment from manufacturers other than Ubiquiti. *See* Hunterbrook Claims n.1. Even more problematic, the Hunterbrook Claims state that the Russian military used a device made by TP-Link and ultimately concede that it is "possible that some of the radio bridge antennae we or our sources believe to be Ubiquiti's ***are made by another manufacturer***." *Id.* (emphasis added).

### D. Plaintiffs Allege Injuries Resulting from Russian Drone Attacks in Ukraine

The Complaint alleges that Plaintiffs were injured in five Russian drone attacks between September 2024 and May 2026.[3] The Complaint does not include any particularized allegations connecting Ubiquiti or any Ubiquiti device to any of these alleged attacks. For example, it does not allege that the Russian military used any Ubiquiti device in these attacks. The Complaint conclusorily alleges that Russian drone units in certain regions of Ukraine were "commanded and controlled through the Ubiquiti radio bridge system." *See, e.g.*, Compl. ¶¶ 118, 128, 135, 141, 149.

---

[2] *See* Jenny Ahn et al., *Ubiquiti: The U.S. Tech Enabling Russia's Drone War*, Hunterbrook Media (Jan. 27, 2026, 6:59 AM EST), https://hntrbrk.com/investigations/ubiquiti [hereinafter Hunterbrook Claims] ("Hunterbrook Capital is short $UI and long a basket of comparable securities" and "Hunterbrook Law is in conversations with litigation firms regarding potential private litigation on behalf of Ukrainians impacted.").

[3] Plaintiffs Diana Kovalenko and Taras Kovalenko proceed under aliases, citing "fear of retaliation by the Russian regime." Compl. ¶¶ 30–31. Rule 6.14 of the S.D.N.Y. Electronic Case Filing Rules requires a party seeking to proceed under a pseudonym to open a miscellaneous case and file a motion for leave before filing the complaint. *See Doe v. Combs*, 2024 WL 4635309, at *2–3 (S.D.N.Y. Oct. 30, 2024). To the extent that these aliases impede Ubiquiti's ability to defend itself or to conduct discovery, it reserves the right to challenge the use of aliases on these or other grounds.

### E. The Complaint Lacks Factual Allegations of Ubiquiti's Knowledge of Illegal Sales of airMAX Products into Russia or of Widespread Use of Ubiquiti Devices by Russian Forces

The Complaint does not include any factual allegations supporting the claim that Ubiquiti knew or should have known about illegal sales of airMAX radio bridges into Russia after the 2022 Invasion or that the Russian military was widely using airMAX radio bridges, much less that it was using them for a "human safari" on Ukrainian civilians. The earliest allegation of Russian military use of Ubiquiti devices is a June 2025 Russian Ministry of Defense video published on state television, *id.* ¶¶ 11, 77, which was nine months after the September 2, 2024 attack on Plaintiff Kovalenko, *id.* ¶¶ 117–27. Other allegations vaguely cite social media posts from "[b]etween 2023 and 2026" but without identifying any specific post, platform, language, or other basis suggesting that Ubiquiti was aware of them or that they were credible. *Id.* ¶ 80. The first alleged indication that could have put Ubiquiti on notice that the Russian military was making widespread use of Ubiquiti devices is the posting of the Hunterbrook Claims on January 27, 2026, *id.* ¶¶ 14, 91–93, but that online article *post-dated* four of the five attacks alleged here. *Id.* ¶¶ 148–53.[4]

The Complaint tries to make something of Ubiquiti's high-level statements that it was "monitoring" the conflict in Ukraine, *id.* ¶ 76, but omits Ubiquiti's contemporaneous statement that it does "not have any visibility on the location or extent of purchases of [its] products by

[4] The Complaint also relies on a series of mischaracterizations, beginning on its cover page, which quotes CEO Robert Pera out of context: "It can't happen again. If it does, I'll be in a lot of trouble." *See* Compl. at i. Twenty pages later, Plaintiffs acknowledge that Pera was referring to Ubiquiti's $500,000 resolution with OFAC in 2014 concerning Iranian sanctions, which has nothing to do with sanctions diversion into Russia after the 2022 Invasion. *Id.* ¶ 84. Similarly, the Complaint cites a May 8, 2014 earnings call—eight years before the 2022 Invasion—in which Ubiquiti stated that it was shipping products to Russia and Ukraine and that some distributors outside Russia were selling products into Russia. But this happened at a time when such sales *were legal*. *Id.* ¶ 55.

individual network operators and service providers from [its] distributors." *See* Ubiquiti Inc., Annual Report (Form 10-K) at 7 (Aug. 22, 2025), https://www.sec.gov/Archives/edgar/data/1511737/000151173725000053/ubnt-20250630.htm (excerpted at Declaration of Anthony C. Piccirillo, dated Nov. 10, 2026 ("Piccirillo Decl."), Ex. A). And Ubiquiti's efforts to protect its intellectual property in Russia, which the Complaint also cites, Compl. ¶ 65, do not bear on whether it knew that intellectual property infringers were selling genuine Ubiquiti devices and, if so, whether such devices were subject to export restrictions or when or how those products entered Russia.

Finally, the Complaint mischaracterizes general U.S. government publications as warnings specifically to Ubiquiti. *Id.* ¶¶ 204–06. However, they were industry-wide regulatory announcements and compliance guidance that applied to thousands of U.S. exporters.

**F. The Complaint Baselessly Claims that Ubiquiti Can Prevent the Use of airMAX Radio Bridges by Russian Forces in Ukraine**

Plaintiffs allege that Ubiquiti provided remote software updates to Ubiquiti devices that telemetry data indicated were located in Russia and Ukraine. *Id.* ¶¶ 12, 75. The Complaint further alleges that Ubiquiti implemented measures in or around September 2025 to block software updates to Russian IP addresses. *Id.* ¶ 68. As the Complaint concedes, however, "[b]locking updates does not disable a device." *Id.*

Relatedly, the Complaint alleges that Ubiquiti failed to incorporate a "kill switch" and a "whitelist" into the airMAX product line, which Plaintiffs claim would have allowed Ubiquiti to remotely disable devices geolocated in Russia or occupied Ukraine. *Id.* ¶¶ 96–98. Plaintiffs contend that SpaceX's decision to deactivate Starlink satellite terminals used by Russian forces demonstrates that this functionality was feasible. *Id.* ¶¶ 99–102. However, Starlink terminals are not comparable to airMAX radio bridges. Starlink requires a continuous subscription-based

connection to its own satellites that constantly track geolocation. By contrast, airMAX radio bridges are point-to-point antennas that Ubiquiti does not control post-sale, including because they can operate without any connection to the internet and have no requirement for ongoing support from or connectivity with Ubiquiti. *Id.* ¶¶ 4, 96.

### G. A Short-Seller Affiliate Posts Claims About Ubiquiti Radio Bridges Being Used by Russian Forces in Ukraine

On January 27, 2026, the Hunterbrook Claims alleged that Ubiquiti's distribution network was funneling products to Russia in violation of U.S. export controls and that Russian forces in Ukraine were using Ubiquiti radio bridges. *Id.* ¶¶ 91–92; *see also* Hunterbrook Claims.

## LEGAL STANDARD

A complaint must be dismissed where the allegations fail to plausibly establish an entitlement to relief as a matter of law. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557–58 (2007).[5] To have facial plausibility, a claim must be more than "merely consistent" with a defendant's liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court does not "credit conclusory allegations or legal conclusions couched as factual allegations." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). Dismissal with prejudice is appropriate where no amended complaint could cure the pleading defects. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The Court may consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019). A document that is relied on in plaintiff's drafting of the complaint may be considered on a motion to dismiss. *Mangiafico v. Blumenthal*,

[5] Unless otherwise indicated, internal citations and quotation marks are omitted from citations.

471 F.3d 391, 398 (2d Cir. 2006). Here, the Court may consider the Hunterbrook Claims despite Plaintiffs' failure to formally cite it or attach it as an exhibit because the Complaint extensively relies on it. *See, e.g.*, Compl. ¶¶ 91–93 (direct references to the Hunterbrook Claims), 77–78 (pictures from the Hunterbrook Claims). Ubiquiti's Forms 10-K for 2022–25 are also incorporated by reference because they are cited and relied upon in the Complaint. *See id.* ¶ 70.

## ARGUMENT

### I. PLAINTIFFS FAIL TO PLEAD FACTUAL CAUSATION

Causation is a necessary legal element of each of Plaintiffs' claims,[6] and Plaintiffs must adequately plead both factual and proximate causation.[7] Plaintiffs adequately plead neither.

To plead factual causation, Plaintiffs must sufficiently allege that Ubiquiti's allegedly tortious conduct was the "but for" cause of Plaintiffs' injuries, meaning "[t]he cause without which

---

[6] *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1066 (N.Y. 2001) (in negligence actions, including negligent entrustment, "a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury"); *Deschamps v. Timberwolf Tree & Tile Serv.*, 101 N.Y.S.3d 418, 419–20 (N.Y. App. Div. 2019) (negligent entrustment claims require a showing of proximate cause); *People v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 202 (N.Y. App. Div. 2003) (in public nuisance actions, "plaintiff … must prove defendants caused or contributed to the nuisance"); *Oden v. Bos. Sci. Corp.*, 330 F. Supp. 3d 877, 888 (E.D.N.Y. 2018) (in products-liability cases, "plaintiff must show that the product at issue was defective and that the defectively designed product was the actual and proximate cause of the plaintiff's injury"); *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (negligent infliction of emotional distress requires "a direct causal connection between the breach and the emotional harm"); *Lihua Gan v. Gsuig Real Est. Member LLC*, 797 F. Supp. 3d 69, 90 (E.D.N.Y. 2025) (in aiding-and-abetting claims, plaintiff must show the underlying tort is the "factual and proximate cause of plaintiff's damages, and also that the aider and abettor's substantial assistance in the breach itself proximately caused plaintiff's damages resulting from that breach").

[7] Solely for purposes of this motion, and without conceding the point, Ubiquiti assumes New York law governs, as Plaintiffs have alleged. Ubiquiti reserves the right to raise a choice-of-law argument as the case proceeds. *See ACIM NY, LLC v. Nissan N. Am., Inc.*, 2019 WL 935424, at *3 (S.D.N.Y. Feb. 26, 2019).

the event could not have occurred." *Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017). Plaintiffs' Complaint fails to allege "but for" causation for two reasons.

*First*, Plaintiffs do not adequately allege that any of the specific Russian attacks that allegedly injured Plaintiffs involved any Ubiquiti devices. The law is clear that to adequately plead a claim, and subject a manufacturer to the costs and burdens of litigation, a plaintiff must sufficiently allege that the defendant's products were involved, and a bare assertion is insufficient to survive a motion to dismiss. *Shumylo v. Texas Instruments Inc.*—which also involved the war in Ukraine—is instructive. There, plaintiffs alleged that defendants' semiconductor chips "were found in weapons used in specific attacks that injured or killed Plaintiffs." 2026 WL 1894422, at *1 (N.D. Tex. July 1, 2026). The court nonetheless dismissed on causation grounds because plaintiffs' "sources also show that Russian weapons have been found to contain components from numerous other companies," making the allegation "merely consistent with [defendants'] liability," rather than providing a factual basis for establishing liability. *Id.* at *6. The court found that there was an "obvious alternative explanation[]" for the harm, as plaintiffs' allegations did not rule out the possibility that the "alleged injuries resulted from another actor's actions." *Id.*

The Complaint here is even weaker than *Shumylo*. Plaintiffs fail adequately to allege that Ubiquiti equipment was associated with any specific attack, or even that Ubiquiti devices (much less any Ubiquiti device that entered Russia after the 2022 Invasion) are the only connectivity devices that Russian drone units could have used. Moreover, the Hunterbrook Claims *concede the Russian military's use of networking devices not made by Ubiquiti*, and that it is "possible that some of the radio bridge antennae we or our sources believe to be Ubiquiti's ***are made by another manufacturer***." Hunterbrook Claims n.1 (emphasis added).

*Second,* Plaintiffs' allegations do not (and cannot) rule out that any Ubiquiti devices allegedly used by the Russian military may have been sold into Russia *before* 2022, when sales were lawful and at a time when Ubiquiti could not have anticipated that its devices theoretically might be used for unauthorized military attacks in Ukraine. Even if arguendo Plaintiffs have plausibly alleged that the specific drone units involved in these attacks made use of Ubiquiti devices—which they have not—Plaintiffs would still need to allege that their injuries were caused by the specific tortious conduct alleged in the Complaint, *i.e.*, Ubiquiti's alleged failure to prevent the downstream sale of airMAX radio bridges into Russia after the 2022 Invasion. But they have not; the Complaint does *not* allege that the devices allegedly involved in these attacks were sold or diverted into Russia after February 2022—which Plaintiffs' counsel conceded was the *earliest that* Ubiquiti could have been on notice of potential misuse of its devices. *See* 10/2/26 Pre-Motion Conf. Tr. ("Tr.") 36:24–37:10 (Piccirillo Decl., Ex. B).

Plaintiffs' failure adequately to plead factual causation means their claims should be dismissed.

## II. PLAINTIFFS FAIL TO PLEAD PROXIMATE CAUSATION

Proximate cause requires a sufficiently causally close connection between a defendant's tortious conduct and the alleged harm suffered to make it fair to impose liability. *Burlington Ins. Co.*, 79 N.E.3d at 481–82. Plaintiffs must allege a "tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position to prevent the wrongs." *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1062 (N.Y. 2001). Proximate cause may be decided as a matter of law. *See, e.g.*, *Megally v. LaPorta*, 679 N.Y.S.2d 649, 654–55 (N.Y. App. Div. 1998).

*First*, Plaintiffs do not, and cannot, allege the requisite "direct link" between Ubiquiti's actions and Plaintiffs' injuries. To the contrary, as depicted below, Plaintiffs have described a

maze involving multiple intervening sales and resales by multiple independent actors all around the world—*none* of whom is alleged to have been controlled by, communicated with, or taken direction from Ubiquiti.[8]




*See* Compl. ¶¶ 60–64. These independent, intervening actions—both individually and collectively—break the causal chain, precluding a finding of proximate causation as a matter of law.

Where intervening misconduct causes injury, a defendant's conduct is a proximate cause only when the intervening act is "a normal or foreseeable consequence of the situation created by"

[8] Plaintiffs' conclusory allegations of direct shipments of products to Russian distributors between March-October 2022, Compl. ¶ 57, are insufficient to plead proximate causation. Not only are those generalized allegations totally unsupported and thus implausible, but Plaintiffs do not plead (1) that those devices were used in these attacks; (2) any involvement by, or even knowledge of, Ubiquiti in the decisions of independent Russian distributors allegedly to supply Ubiquiti products to the Russian military; or (3) that the Russian military used Ubiquiti equipment against civilians. Those defects all preclude proximate causation as a matter of law.

the defendant. *Fleming v. Endo Int'l*, 2019 WL 4378964, at *3 (S.D.N.Y. Aug. 27, 2019); *Hamilton*, 750 N.E.2d at 1062 (declining to impose liability without a showing that gun manufacturers were a "direct link in the causal chain that resulted in plaintiffs' injuries"). That standard is high—as demonstrated by *People v. Sturm, Ruger & Co.*, which affirmed the dismissal of public nuisance claims against handgun manufacturers, wholesalers, and retailers over plaintiffs' argument that they were allegedly on "actual and constructive notice" that their guns were being used in crimes because they received "trace requests" from law enforcement. 761 N.Y.S.2d 192, 194 (N.Y. App. Div. 2003).

Again, Plaintiffs' pleading here is weaker, and consists of little more than a conclusory allegation that "Ubiquiti retained full practical control over its distribution chain throughout this period" and sensationalist references to "Ubiquiti's sanctions-evasion network." Compl. ¶¶ 60, 63–64, 66, 95. Underscoring the implausible nature of Plaintiffs' allegations, the Complaint grasps at the following alleged facts: (1) Ubiquiti's alleged audit rights over its authorized distributors—which are inadequate to establish that Ubiquiti controlled a network of international resellers, smugglers, and straw purchasers, including entities that had no dealings with authorized Ubiquiti distributors; and (2) Ubiquiti's registration of "its logo with Russia's intellectual property agency." Compl. ¶¶ 65, 95. Such speculative and threadbare allegations do not provide the factual content needed to support an inference in Plaintiffs' favor. *See Iqbal*, 556 U.S. at 678.[9]

---

[9] Plaintiffs' alternative failure-to-disable theory is no less attenuated—not least because it is riddled with intervening acts. That theory requires the Court to assume that Ubiquiti had the technical ability to identify a particular device already in Russia or occupied Ukraine, successfully push code that would disable that device (while not disabling use by Ukrainians), prevent the Russian military from blocking any such disabling updates, prevent the Russian military from replacing Ubiquiti devices with another device or another manufacturer's equipment, and thereby prevent the specific drone units that harmed Plaintiffs from carrying out their attacks. The Complaint pleads none of those links with the requisite plausibility. *See* Compl. ¶¶ 12, 75, 96–103, 188–90.

*Second*, Plaintiffs' causation theory is too attenuated and remote to establish proximate causation as a matter of law, which courts have recognized is a requirement serving the important public policy purpose of safeguarding against these types of claims. In *Sturm*, the court observed that allowing claims like this against manufacturers would "open the courthouse doors to a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities … [where a company] makes, markets and/or sells its nondefective, lawful product or service." 761 N.Y.S.2d at 196. The court held that, as here, "the harm plaintiff alleges is far too remote from defendants' otherwise lawful commercial activity" and that such activity, "having been followed by harm to person and property caused directly and principally by the criminal activity of intervening third parties, may not be considered a proximate cause of such harm." *Id.* at 201.[10]

Plaintiffs' failure adequately to plead proximate causation requires dismissal.

## III. PLAINTIFFS LACK STANDING

For the same reasons that Plaintiffs fail to plead factual and proximate causation, they also lack standing under Article III of the Constitution. To have standing, Plaintiffs must establish that their alleged injuries are "fairly traceable" to Ubiquiti's alleged conduct. An injury is not "fairly traceable" to a defendant's conduct if the connection between the two is merely speculative, too attenuated, or the result of "the independent action of some third party not before the court." *Lujan*

[10] Consistent with these principles, courts have dismissed on proximate causation grounds other suits that sought to hold companies liable for the illegal acts of sovereign countries. *See, e.g.*, *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (allegations that UBS provided U.S. currency to Iran insufficient to establish that UBS's conduct was the proximate cause of plaintiffs' injuries from Iranian-funded attacks); *Shumylo*, 2026 WL 1894422, at *6 (allegations that defendants sold components ultimately used in Russian weapons were too attenuated to establish causation).

*v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also Coubaly v. Cargill, Inc.*, 144 F.4th 343, 346–51 (D.C. Cir. 2025) (finding lack of standing in a case alleging cocoa importers' use of forced child labor because plaintiffs had not plausibly alleged that the defendants directly or indirectly sourced cocoa from the specific farms where plaintiffs suffered their injuries); *Ali v. Al-Nahyan*, 808 F. Supp. 3d 88, 118 (D.D.C. 2025) (finding lack of standing because plaintiffs could not trace a weapons manufacturer to injuries from Saudi airstrikes in Yemen, as there were multiple potential sources for the weapons).

This case presents the same traceability defect as *Coubaly* and *Ali*: Plaintiffs plead a broad unlawful supply-chain theory, but do not connect any Ubiquiti device sold by Ubiquiti to the specific Russian attacks or injuries alleged here. *See Coubaly*, 144 F.4th at 350; *Ali*, 808 F. Supp. 3d at 118. In addition, the Complaint does not foreclose the possibility that the attacks involved equipment from another manufacturer or a Ubiquiti device that was sold into Russia before the 2022 Invasion, when sales were lawful. *Cf. Coubaly*, 144 F.4th at 350 ("It's not enough to allege only that some [i]mporter might (or might not) have bought cocoa from a farm at a time that a [p]laintiff might (or might not) have been forced to work there."). Finally, the causal chain involves the intervening acts of third parties not before the Court, including an alleged network of international smugglers. *See Lujan*, 504 U.S. at 560; *Bannister v. U.S. Treasury Dep't*, 2021 WL 4443020, at *3 (S.D.N.Y. Sept. 28, 2021) ("Consistently, the Supreme Court, and the rest of the judiciary, have held that plaintiffs fail to show traceability where their alleged injuries are caused by third parties' intervening conduct.").

Because Plaintiffs' injuries are not fairly traceable to Ubiquiti, the Complaint should be dismissed for lack of Article III standing.

## IV. PLAINTIFFS FAIL TO ALLEGE ANY DUTY REQUIRING UBIQUITI TO PROTECT THEM FROM A FOREIGN MILITARY'S DOWNSTREAM MISUSE OF ITS PRODUCTS, WARRANTING DISMISSAL OF ALL NEGLIGENCE AND PRODUCT LIABILITY CLAIMS (COUNTS I, III–V)

The Complaint does not plead, as it must, that Ubiquiti breached a duty owed to Plaintiffs.[11] And nor could it, as Plaintiffs fail to plead any relationship between Ubiquiti and Plaintiffs sufficient to establish any such duty as a matter of law.

Under New York law, a plaintiff must plead that the defendant owed "not merely a general duty to society but a specific duty to him or her." *Hamilton*, 750 N.E.2d at 1060. New York "does not impose a duty upon a manufacturer to refrain from the lawful distribution of a non-defective product." *Forni v. Ferguson*, 648 N.Y.S.2d 73, 74 (N.Y. App. Div. 1996); *see also McCarthy v. Olin Corp.*, 119 F.3d 148, 157 (2d Cir. 1997) (holding that an ammunition manufacturer owed no duty to mass-shooting victims injured by criminal misuse of non-defective ammunition). "Without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." *Lauer v. City of New York*, 733 N.E.2d 184, 187 (N.Y. 2000). That limitation is necessary to avoid "unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1101 (N.Y. 2001). Consequently, a

[11] Duty is a necessary element of Plaintiffs' negligence and products liability claims. *Hamilton*, 750 N.E.2d at 1060 (a plaintiff must show that the defendant owed "a specific duty to him or her" in negligence actions, including negligent entrustment); *Elsroth v. Johnson & Johnson*, 700 F. Supp. 151, 163 (S.D.N.Y. 1988) (in design-defect cases, "the manufacturer owes no duty to design a product impervious to criminal misuse"); *Francis*, 992 F.3d at 81 (negligent infliction of emotional distress requires "a breach of a duty owed to the plaintiff"). The Complaint's deficiencies with respect to duty are also intertwined with Plaintiffs' failure to plead causation, as discussed above. *Megally*, 679 N.Y.S.2d at 654–55 (noting that both duty and causation stem "from policy considerations intended to place manageable limits upon the liability that flows from negligent conduct").

manufacturer's duty to users, consumers, and other persons foreseeably endangered by a product's *ordinary* use does not extend to every person harmed if the product is, for example, smuggled into a foreign military's communications network and then used to facilitate drone attacks. *See Hamilton*, 750 N.E.2d at 1061–65 (holding that handgun manufacturers owed no duty to shooting victims allegedly harmed after guns passed through "several links" in the distribution chain and were criminally misused by third parties).

*Hamilton* is particularly instructive. There, the New York Court of Appeals declined to impose a broad duty on handgun manufacturers that plaintiffs argued were uniquely positioned to reduce the risk that their products would reach criminal users through downstream distribution channels. 750 N.E.2d at 1059–66. The court emphasized that even potential foreseeability of downstream misuse is insufficient to create such a duty: "[f]oreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist." *Id.* at 1060.

The same principle applies here, where Plaintiffs do not claim that an airMAX radio bridge injured them in ordinary use, but rather that the Russian military allegedly obtained the devices—designed for civilian commercial and residential use—through independent distributors, resellers, smugglers, and military actors, and then used them to facilitate drone attacks. *See* Compl. ¶¶ 57, 60–68, 77–80, 107–16. Plaintiffs ask this Court to embrace a novel theory of liability—one which, if sustained, would expose every manufacturer of a communications product to liability for harm anywhere in the world caused by unauthorized military or criminal use of the product after it was acquired by some downstream reseller. Unsurprisingly, the New York Court of Appeals in *Hamilton* foreclosed such boundless liability.

Nor can Plaintiffs overcome the duty requirement by recasting their theory as one premised on Ubiquiti's alleged failure to disable its devices after sale. A defendant generally has no duty to

control the conduct of third persons to prevent them from harming others, absent a special relationship with either the wrongdoer or the victim. *See D'Amico v. Christie*, 518 N.E.2d 896, 901 (N.Y. 1987); *Purdy v. Pub. Adm'r of Cnty. of Westchester*, 526 N.E.2d 4, 7 (N.Y. 1988); *Hamilton*, 750 N.E.2d at 1061–62. The Complaint alleges no such relationship with Plaintiffs or the Russian military. Compl. ¶¶ 57, 60–68, 107–16. Plaintiffs' allegation that Ubiquiti could terminate distributors, track devices, or push firmware updates, even if true, does not establish control over devices already outside Ubiquiti's possession—much less control over a foreign military's battlefield decisions. *Id.* ¶¶ 75, 95–103. Moreover, in an age when countless manufacturers of everyday civilian products routinely send software updates to users throughout the world, Plaintiffs' theory raises the specter of the "unlimited liability to an indeterminate class" that the New York Court of Appeals expressly warned against. *532 Madison*, 750 N.E.2d at 1101.

An additional problem is that Plaintiffs' novel theory has no limiting principle. At the pre-motion conference, the Court observed that Plaintiffs' theory "could pull in … the makers of cameras, the makers of microchips, the makers of computers, the makers of mobile phones, GPS devices, fiberoptic cable," and asked, "Where does it end?" Tr. 30:15–31:1 (Piccirillo Decl., Ex. B). Plaintiffs answered that it "ends with foreseeability," *id.* at 31:2–3, and—in an answer that foreshadows the types of cases that could follow—conceded that a chipmaker whose product found its way into a drone system could "[p]otentially" be liable, *id.* at 28:17–18. But foreseeability is precisely the limiting principle the *Hamilton* court rejected as *insufficient* to create a duty. 750 N.E.2d at 1060–61.

Plaintiffs ultimately acknowledged that they do not know of any case recognizing the type of duty that they propose, and conceded that they are asking this Court to be the first. Tr. 43:18–

44:15 (Piccirillo Decl., Ex. B). Plaintiffs' failure to plead the required duty mandates dismissal of their negligence-based and products liability claims (Counts I, III–V).

## V. PLAINTIFFS FAIL TO ALLEGE NEGLIGENT ENTRUSTMENT (COUNT I)

Negligent entrustment requires allegations that (1) the defendant owed a duty to the plaintiff; (2) the defendant knew the entrusted instrumentality would likely be used in a manner creating an unreasonable risk; and (3) the entrustment factually and proximately caused injury. *Hamilton*, 750 N.E.2d at 1061–66. Plaintiffs' negligent entrustment claim fails for lack of duty and lack of causation, as discussed above. *See* Sections I–II, IV, *supra*. The claim also fails because the Complaint does not plead that (1) Ubiquiti devices were dangerous products; (2) Ubiquiti had post-sale control over the particular devices allegedly used; or (3) Ubiquiti had special knowledge that a particular entrustee had a propensity to use the devices dangerously.

*First*, and most fundamentally, airMAX radio bridges are not dangerous instruments. Negligent entrustment liability attaches to the supply of a chattel that is inherently dangerous, such as a firearm or a vehicle entrusted to an unfit user. *See Hamilton*, 750 N.E.2d at 1064–65. Ubiquiti's devices are civilian networking devices used in businesses and homes around the world for inherently safe purposes; they are not weapons, explosives, or targeting equipment. When the Court asked about any case law finding that telecommunications equipment is a dangerous instrument, Plaintiffs could identify none, acknowledging that they "don't have a prior case where you have dual-use technology that is subject to Export Controls and international arms agreements" and conceding that they are "[p]otentially" asking the Court "to be the first judge to so hold." Tr. 42:18–44:9 (Piccirillo Decl., Ex. B).

*Second*, New York law does not require a manufacturer to police downstream dealers or remote end users after a product has entered the stream of commerce, including "an affirmative duty to investigate and identify corrupt dealers." *Hamilton*, 750 N.E.2d at 1065. To state a

negligent entrustment claim based on subsequent downstream transactions, a plaintiff must allege that the manufacturer exercised sufficient control over the chattel to prevent its misuse after it entered the stream of commerce. *Id.* at 1064–66. The Complaint does not contain any non-conclusory allegations of control by Ubiquiti over downstream sales of Ubiquiti devices through alleged international smuggling networks. Extending negligent entrustment liability to a manufacturer of general-purpose networking technology for downstream misuse by a foreign military would "wreak incalculable harm upon commerce." *Stutts v. De Dietrich Grp.*, 2006 WL 1867060, at *18 (E.D.N.Y. June 30, 2006).

*Third*, the Complaint fails to allege that Ubiquiti had "special knowledge concerning a characteristic or condition peculiar to the person to whom a particular chattel is given." *Cook v. Schapiro*, 871 N.Y.S.2d 714, 716 (N.Y. App. Div. 2009). The Complaint does not plead that any person to whom Ubiquiti entrusted its products had a peculiar propensity to misuse a particular airMAX device to attack civilians. *See Grandelli v. City of New York*, 232 N.Y.S.3d 111, 113 (N.Y. App. Div. 2025) (dismissing negligent entrustment claims against Home Depot arising from a truck rented to a terrorist because Home Depot lacked "some special knowledge concerning a characteristic or condition peculiar" to the renter that would make his use of the truck unreasonably dangerous). Instead, Plaintiffs point to industry-wide export-control rules, general compliance guidance, and a 2014 statement by Ubiquiti (made eight years earlier, when exports to Russia were legal) that distributors "more than likely move some products into Russia." Compl. ¶¶ 55, 73, 82, 85, 95. But those allegations do not reflect particularized knowledge that any identified distributor or end user had a "propensity for violence," or any other illegality. *Grandelli*, 232 N.Y.S.3d at 114.

Finally, even to the extent telemetry data indicated, as alleged, that devices were operating in Russia, Compl. ¶ 75, that data is at most after-the-fact indicia of location and not pre-sale knowledge of any particular entrustee's propensity for improper use because the purported telemetry data says nothing about how, when, and from whom the Russian military obtained a particular device. Nor do the Complaint's references to Russian media or the Hunterbrook Claims establish what Ubiquiti knew when it allegedly sold devices pre-2022—and in any event, all but one of Plaintiffs' attacks preceded the Hunterbrook Claims' January 27, 2026 posting. Compl. ¶¶ 28–34, 77–80, 91–94.

Because the Complaint does not plead a breach of duty to specific Plaintiffs, control over the products post-sale, special knowledge of a dangerous entrustee, or causation, Count I should be dismissed.

## VI. PLAINTIFFS FAIL TO STATE A CLAIM FOR PUBLIC NUISANCE (COUNT II)

To state a claim for public nuisance, Plaintiffs must establish (1) the existence of a public nuisance; (2) conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and (3) particular harm suffered by plaintiff that is different in kind from that suffered by the community at large as a result of the public nuisance. *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 428 (E.D.N.Y. 2017). As discussed in Sections I–II and IV, Plaintiffs have not pleaded facts establishing that Ubiquiti's conduct was the factual or proximate cause of their injuries or that Ubiquiti owed Plaintiffs a duty to prevent a foreign military's downstream misuse of Ubiquiti devices. The public nuisance claim is also subject to dismissal because it raises a non-justiciable political question and because the alleged public nuisance is not abatable by this Court.

Plaintiffs' request for the Court to recognize a public nuisance in Russian-occupied Ukraine would require the Court to make judgments about the actions of a sovereign nation in a foreign conflict. That is quintessentially a political question that is reserved for the political

branches. *See Baker v. Carr*, 369 U.S. 186, 211 (1962); *see also Sturm*, 761 N.Y.S.2d at 203 (referencing policy determinations "best left to the Legislative and Executive branches"). The Legislative and Executive branches are actively managing United States policy with respect to the conflict in Ukraine. Therefore, any adjudication by this Court on the nature of Russia's conduct in that conflict would interfere with those branches' Constitutionally allocated duties. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982–84 (9th Cir. 2007) (affirming dismissal involving claims against a manufacturer based on foreign sovereign's military use of equipment because adjudication would require the court to question political-branch decisions about military aid and foreign policy).

Moreover, where the alleged condition lies beyond the reach of any U.S. court or governmental agency, it is not a cognizable public nuisance. Under New York law, a public nuisance is "an offense against the State … subject to abatement or prosecution on application of the proper governmental agency." *Copart Indus., Inc. v. Consol. Edison Co.*, 362 N.E.2d 968, 971 (N.Y. 1977). The Complaint identifies the alleged nuisance as Russia's "human safari," described as a "widespread, systematic campaign of drone and drone-assisted attacks on civilians" conducted by "Russian occupation forces." Compl. ¶¶ 112–14, 182. But no U.S. court can enjoin the Russian military, order it to cease drone operations, or restrain the conduct of its armed forces in a foreign theater of war. This distinguishes the present case from paradigmatic public nuisance cases where actors *can* be enjoined. *See, e.g.*, *State v. Schenectady Chems., Inc.*, 459 N.Y.S.2d 971, 973 (N.Y. Sup. Ct. 1983) (chemical dump); *City of Rochester v. Premises Located at 10-12 S. Wash. St.*, 687 N.Y.S.2d 523, 527 (N.Y. Sup. Ct. 1998) (repeated nightclub disorderly crowd); *see also Sturm*, 761 N.Y.S.2d at 203–04 (expressing skepticism that courts could effectively monitor or enforce

judicially ordered changes to manufacturers' product design, marketing, and distribution practices, and concluding that "a court is uniquely ill-equipped to do so").

For the foregoing reasons, Plaintiffs' public nuisance claim should be dismissed.

## VII. PLAINTIFFS FAIL TO ALLEGE ANY PRODUCT DEFECTS (COUNTS III–IV)

The products liability theory underlying Counts III–IV fails because Plaintiffs do not plead either a duty owed to Plaintiffs or causation. *See* Sections I–II, IV, *supra*. These claims also fail because Plaintiffs fail to allege a defect in Ubiquiti's devices.[12]

A design-defect plaintiff must show that "the defective design was a substantial factor in causing plaintiff's injury." *Quintana v. B. Braun Med. Inc.*, 2018 WL 3559091, at *3 (S.D.N.Y. July 24, 2018). The question is whether the product, as designed, was not reasonably safe. *Dunham v. Covidien, LP*, 498 F. Supp. 3d 549, 557 (S.D.N.Y. 2020). "There must be something wrong with the product, and if nothing is wrong there will be no liability." *Forni*, 648 N.Y.S.2d at 74. That inquiry is not an abstract invitation to imagine any feature that might deter any downstream misuse. It asks instead whether the product was reasonably safe for intended or reasonably foreseeable uses, and it does not impose a duty to make a non-defective product impervious to intentional criminal misuse by remote third parties. *See Dunham*, 498 F. Supp. 3d at 557; *Elsroth v. Johnson & Johnson*, 700 F. Supp. 151, 163 (S.D.N.Y. 1988).

The Complaint does not allege a product that malfunctioned or was unsafe for its intended operation. To the contrary, Plaintiffs' theory is that the products "work too well." *Hamilton*, 750 N.E.2d at 1063. Plaintiffs allege that airMAX devices continued to function, and Plaintiffs criticize Ubiquiti for not adding functionality that would disable them. Compl. ¶¶ 188–90, 193–

[12] Plaintiffs allege negligent design and strict-liability design defect claims, which are "functionally synonymous" under New York law. *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 735 (N.Y. 1995).

94. But the absence of a software limitation that would prevent a certain class of users from using a lawfully designed networking device is not a design defect under New York law. *See Elsroth*, 700 F. Supp. at 163. In *Elsroth*, the court found that the use of gelatin capsules did not constitute a design defect because they were safe unless tampered with, and "the manufacturer owes no duty to design a product impervious to criminal misuse" even though the manufacturer was aware the "packaging could be violated by a determined tamperer using sophisticated means, and that no evidence of this kind of sophisticated tampering would be visible to the average consumer." *Id.* at 161, 163. The Complaint identifies no malfunction, unsafe component, or operational failure that caused any injury; it only alleges the Russian military's misuse of a functioning product.

Plaintiffs' theory also goes too far. It would require manufacturers of computers, routers, phones, and other connected devices to monitor where every device is located and to retain the ability to disable devices remotely whenever a manufacturer concludes that a user is unauthorized. As the Court observed, it is far from clear that "we as a society want the manufacturer exerting that kind of post-sale control," which would be "a little scary." Tr. 35:1–14 (Piccirillo Decl., Ex. B). Design-defect law asks whether a product is reasonably safe as designed for its intended and reasonably foreseeable uses; it does not convert every technology company into a global post-sale enforcer of export controls.

Nor is there any authority for Plaintiffs' assertion that a manufacturer is required to incorporate a "kill switch" in a properly functioning product to guard against intentional misuse by a bad actor. The cases cited by Plaintiffs at the pre-motion conference do not support their theory. In *Voss v. Black & Decker Manufacturing Co.*, which involved a circular saw that injured a user during the product's intended operation, plaintiff argued that an alternative guardrail design directed at that product hazard should have been adopted. 450 N.E.2d 204, 206 (N.Y. 1983). *Voss*

does not require manufacturers to protect against risks arising from intentional misuse of the product, as opposed to risks presented by ordinary operation of the product.

Cases involving Apple AirTags are equally unhelpful to Plaintiffs.[13] *Hughes v. Apple Inc.* involved a device whose core function was to track personal items and rested on allegations that one of the features of the product itself—Apple's anti-stalking safeguards—was defectively designed. 723 F. Supp. 3d 693, 696–700 (N.D. Cal. 2024). Here, unlike *Voss* or *Hughes*, the Complaint does not allege a malfunction or product-safety defect in the ordinary operation of airMAX radio bridges. Plaintiffs instead allege that Ubiquiti should have added a remote-disable feature to prevent a foreign military's downstream and unauthorized misuse after potentially countless intervening sales. That is not a cognizable design-defect theory under New York law.

Plaintiffs' Starlink comparison likewise does not work. *See Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 405 (S.D.N.Y. 2013) (holding that "an allegation that [defendant] could have manufactured a different product altogether, or that others have done so, does not itself make out a plausible claim of a design defect"). The Complaint acknowledges that "Starlink terminals and Ubiquiti radio bridges play complementary—but not substitutable—roles": a Starlink terminal is a satellite-internet access point, while a Ubiquiti radio bridge broadcasts wireless signals connecting devices at long range. *See* Compl. ¶ 101 n.25. A Starlink terminal must communicate with a Starlink satellite to operate, which gives SpaceX an inherent ability to continuously observe and control the terminal. A Ubiquiti radio bridge instead broadcasts from any available internet source and does not need to be in contact with Ubiquiti—or even connected to the internet—to

[13] Moreover, in *Hughes*, California product liability claims survived under the state's burden-shifting risk-benefit framework, but the court dismissed the New York (and other states') product-liability claims because plaintiffs failed to plead an alternative design as required by those states' laws. *See Hughes v. Apple Inc.*, 2024 WL 4828072, at *1–3 (N.D. Cal. Nov. 18, 2024).

operate. Consequently, the Complaint's assertion that Ubiquiti "already had the remote-update infrastructure that a kill switch or whitelist requires," *id.* ¶ 189, is conclusory at best.[14]

Counts III–IV should thus be dismissed.

## VIII. PLAINTIFFS FAIL TO ALLEGE NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (COUNT V)

To state a claim for negligent infliction of emotional distress under New York law, a plaintiff must allege "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021). Whether proceeding under a bystander theory (which requires the plaintiff to have been in the "zone of danger" created by the defendant's negligence) or a direct-duty theory (which requires a breach of duty that unreasonably endangered plaintiff's physical safety), *see Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996), the claim fails because the danger to Plaintiffs resulted from the Russian military, not Ubiquiti. *See* Sections I–II, IV, *supra*. Ubiquiti did not owe this type of legal duty to Plaintiffs, did not place them in any zone of danger, and its conduct is too remote from the physical harm they suffered to support a causal connection. *See Francis*, 992 F.3d at 81 (no duty to prevent third parties from injuring others absent authority to control their conduct). Because Plaintiffs cannot establish duty, breach, or direct causal connection under either theory, Count V should be dismissed.

---

[14] With respect to Plaintiffs' "whitelist" theory, the Complaint itself recognizes that SpaceX created a "whitelist" by working with the Ukrainian government to identify and block unauthorized Russian Starlink terminals while preserving Ukrainian terminals. *See* Compl. ¶ 101 n.25. A "whitelist" would thus require Ubiquiti to take actions that go far beyond product design—and Plaintiffs point to no authority requiring it do so.

## IX. PLAINTIFFS FAIL TO ALLEGE THAT UBIQUITI AIDED AND ABETTED ANY ASSAULT, BATTERY, OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNTS VI–VIII)

Plaintiffs' aiding-and-abetting claims fail because the Complaint does not plead the actual knowledge and substantial assistance required for liability, and it does not plead the underlying intentional torts as to all Plaintiffs. Under New York law, a plaintiff must allege "(1) the existence of a violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor." *King Cnty. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 299–300 (S.D.N.Y. 2012).

### A. Plaintiffs' Claims Fail for Lack of Knowledge

The Complaint fails to plead Ubiquiti's actual knowledge of any assault, battery, or intentional infliction of emotional distress. The knowledge element requires a strong inference of actual knowledge of the underlying tort at the time of the assistance. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006). Neither "red flags" nor evidence that a defendant should have known of a risk is enough. *Horowitz v. AJP Educ. Found., Inc.*, 2026 WL 945684, at *7 (S.D.N.Y. Apr. 1, 2026). Here, the Complaint does not allege facts supporting a strong inference that, when Ubiquiti sold or sent software updates to any particular device after the 2022 Invasion, it knew that the device would be illegally transported into Russia, pass through several hands before reaching the Russian military, and then be used in a particular assault, battery, or campaign of intentional emotional abuse against these Plaintiffs. Conclusory references to "willful blindness" and what Ubiquiti should have known cannot substitute for actual knowledge. *Pension Comm.*, 446 F. Supp. 2d at 201 n.279 (stating that for aiding-and-abetting claims, "the overwhelming weight of authority holds that actual knowledge is required, rather than a lower standard such as recklessness or willful blindness"). Indeed, the

Complaint itself concedes that it was not until the January 27, 2026 Hunterbrook Claims that Ubiquiti was put on "direct, public notice," Compl. ¶¶ 91–92, but the Hunterbrook Claims post-date every alleged attack except the May 2026 Tsylinko attack, and in any event include only allegations about the Russian military's use of Ubiquiti devices generally and not with respect to the specific alleged attacks. *Id.* ¶¶ 28–34.

### B. Plaintiffs' Claims Fail for Lack of Substantial Assistance

The sale of products is not substantial assistance. The Supreme Court has warned that "if aiding-and-abetting liability were taken too far, then ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489 (2023). The Complaint does not allege Ubiquiti's participation in the Russian military's attacks. It alleges only that products and firmware moved through distributors and that Russian forces used networking equipment in their own command structure. Compl. ¶¶ 60–67, 107–16. And the boilerplate allegation that some regions were attacked by Russian forces "commanded and controlled through the Ubiquiti radio bridge system," *id.* ¶¶ 118, 128, 135, 141, 149, does not identify a Ubiquiti device used in any particular attack or establish contact between Ubiquiti and the Russian military.

### C. Plaintiffs Fail to Plead an Underlying Battery

The aiding-and-abetting battery claims of Taras Kovalenko, Liubov Savchenko, and V.S. fail because there is no alleged underlying battery. "To make out a prima facie claim of battery, the plaintiff must establish (1) the defendant made bodily contact, (2) that was harmful or offensive, (3) with intent and (4) without the plaintiff's consent." *Naughright v. Weiss*, 826 F. Supp. 2d 676, 685 (S.D.N.Y. 2011). The Complaint alleges that Kovalenko suffered emotional harm and was chased by a drone at his father's grave, and that Savchenko and V.S. learned of Anatoliy's death and lived in fear of later attacks. Compl. ¶¶ 31–32, 127, 132–33. It does not

allege that any drone, explosion, or other harmful or offensive contact touched them. Their battery claims therefore fail before the Court even reaches the question of Ubiquiti's alleged assistance.

Because Plaintiffs fail to plead causation, actual knowledge, substantial assistance, or, in several instances, an underlying assault, battery, or intentional infliction of emotional distress by reference to Ubiquiti's conduct, Counts VI–VIII should be dismissed.

## CONCLUSION

For the foregoing reasons, and because repleading would be futile, the Court should dismiss the Complaint in its entirety and with prejudice.[15]

[15] Ubiquiti reserves the right to file a separate motion to dismiss on *forum non conveniens* grounds. *See Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG,* 160 F. Supp. 2d 722, 742 (S.D.N.Y. 2001).

Respectfully submitted,

Dated: November 10, 2026
New York, New York

*/s/ Timothy G. Cameron*

Nicholas S. Goldin
Timothy G. Cameron
Anthony C. Piccirillo
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
ngoldin@stblaw.com
tim.cameron@stblaw.com
anthony.piccirillo@stblaw.com

Abram J. Ellis
SIMPSON THACHER & BARTLETT LLP
900 G St. NW
Washington, DC 20001
Telephone: (202) 636-5500
aellis@stblaw.com

*Attorneys for Defendant Ubiquiti Inc.*

## WORD COUNT CERTIFICATION

I, Anthony C. Piccirillo, submit this certification pursuant to Rule 7.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York:

I hereby certify that the word count of Ubiquiti's Memorandum of Law in Support of its Motion to Dismiss complies with the word limits outlined by Rule 7.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York, Rule II.B of this Court's Individual Rules and Practices, and this Court's order (Dkt. 33) allotting a total of 9,750 words for memoranda of law.

According to the word-processing system used to prepare this filing, the total word count for all printed text exclusive of the material omitted under Rule 7.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York is 9,445 words.

Dated: November 10, 2026
New York, New York

*/s/ Anthony C. Piccirillo*

Anthony C. Piccirillo
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
anthony.piccirillo@stblaw.com

**ARTIFICIAL INTELLIGENCE USE CERTIFICATION**

I, Anthony C. Piccirillo, submit this certification pursuant to Rule II.N of this Court's Individual Rules and Practices:

I hereby certify that counsel used an artificial intelligence tool in preparing this filing to assist with drafting, editing, and formatting. This filing has been reviewed for substantive and technical citation accuracy, and every statement and citation to an authority contained in this filing has been verified by an attorney in this case as to the accuracy of the proposition for which it is offered.

Dated: November 10, 2026
New York, New York

*/s/ Anthony C. Piccirillo*

Anthony C. Piccirillo
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
anthony.piccirillo@stblaw.com